RENDELL, Circuit Judge,
dissenting.
I respectfully dissent because I conclude that the District Court should not have admitted Officer Kraus’s testimony concerning Lee’s post-arrest statements regarding Lee’s prior experiences with guns, violent feuds, and past experiences with Officer Kraus, and that this error was not harmless. I acknowledge that this is a close case and that our standard is deferential, but I submit that when it comes to guns, we must be careful, for the prejudicial impact on the jury of this type of character evidence is very real indeed.
The majority opinion refers to salient portions of Kraus’s testimony but it is worth including it in its totality. I number distinct points for ease of reference. Kraus testified that, in a post-arrest interview: [1]
1. Lee insisted he does not typically own or carry guns. However, he did state that he has access to a lot of guns and
2. would use them against anyone who threatens him or his family.
3. He stated that he shot at an individual named Pickles, who was well known as Ernest Harris, on multiple occasions.
4. He went on to say that I arrested Pickles, which is true, in the past, with a firearm. And Mr. Lee claimed that on that night, that Ernest Harris, Pickles was arrested, that Pickles was actually on his way with that gun to kill Mr. Lee. He acknowledged that and said that there’s a long time, ongoing violent feud between Mr. Lee’s family and Pickles....
5. Lee continued to insist that he did not have any weapons in the car when I stopped him on June 27th, but he did compare that to a time when, he stated that he fled from me before in the Hill District. He asked me if I remembered the time that I chased him and lost the car that started on Morgan Street in the hill. As I was remembered, he stated that I pulled behind him, I had my — at that time in a marked police car, when I *198 was in uniform in patrol in the Hill District, I guess I was behind him, according to him, and I had my white illumination lights, which are like spotlights contained on the light bar of the car which we can access, and when he saw those lights, he claimed that he thought I was preparing to pull him over. So he stopped, motioned me alongside of him to ask for directions to Chauncey Street. I did remember that. He went on to say that he had — I had gotten out of the car because I had smelled marijuana and as I approached, the ear he took off. And I do remember this. It would have been probably back in 2001 or 2002. I didn’t know at the time it was Mr. Lee. There was no connection at that point, but I did remember that.
6. He further told me that if I would have caught him that night, I would have caught him with guns in the car, but, again, he continued to insist that he had no guns in the car on June 27th when I stopped him.
App. 417-18. The majority concludes that the initial references to the facts that Lee had access to guns and would use them to protect his family (statements 1 and 2), and that he had an ongoing violent feud with Ernest “Pickles” Harris (statement 4), were admissible as probative of Lee’s “motive,”[2] and that this outweighed the prejudice caused by the reference to his prior gun possession. It reasons that the rest of the passage (statements 5 and 6) should not have been admitted but that its admission does not require a new trial because it was “highly probable” that the offending statements did not contribute to the verdict. I respectfully disagree.
As a trial court judge, I was always concerned about references to past possession or use of guns in gun cases, and references to past possession or use of drugs in drug cases. While often admissible as going to a proper purpose under Rule 404(b), from an evidentiary standpoint, this type of evidence makes the jury’s job (i.e. to avoid using this type of evidence as branding the defendant as a gun or drug criminal) very difficult, as a practical matter.
While the potential impact of this type of evidence can nonetheless be contained by specific instructions to the jury, the prejudice resulting from evidence of guns and drugs is immense. As the Advisory Committee’s Note to Rule 404(a) indicates, this type of character evidence epitomizes what “prejudice” is all about:
Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.
Fed.R.Evid. 404(a) Advisory Committee’s Note. I submit that the potential for such “distraction” is especially great in gun and drug cases.
*199 Prior bad act evidence is governed by Rule 404(b), which, as the majority notes, involves a four-step test requiring courts to assess proper purpose and relevance, to weigh prejudice against probative value under Rule 403, and to offer an appropriate limiting charge to the jury. Huddleston v. United States, 485 U.S. 681, 691-92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The Advisory Committee Notes to Rule 404(b) state that, while evidence of other wrongs or acts is “not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it,” such evidence “may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition.” None of the statements here were admitted for a proper purpose.
First of all, the part of the statement that the majority has held is probative of motive, regarding Lee’s willingness to use guns to protect his family and the ongoing feud in which he is engaged, is only a small part of what the jury heard. As noted above, the jury also heard Officer Kraus testify that Lee told him that he had access to “a lot of guns,” that he has shot at Ernest “Pickles” Harris “on multiple occasions,” that he has previously fled from Officer Kraus because Officer Kraus smelled marijuana coming from his car, and that he did have guns in his car during this previous encounter with Officer Kraus. None of these other, very colorful, statements — which I have labeled 1, 3, 5, and 6 — go to Lee’s motive for possessing guns in general, let alone to his motive for possessing a rifle on this particular occasion. The majority rightly criticizes the “proper purpose” theories offered by the Government other than motive (knowledge, intent, absence of mistake, modus operandi), recognizing that the only statements that may have been properly admitted are those that could be relevant to motive. The other statements from Officer Kraus’s testimony have no probative value and fail the ‘relevance’ test of Huddleston entirely. They should have been excised from what the jury heard.[3]
The other two portions of Officer Kraus’s testimony, referencing the facts that Lee would use guns to protect his family and that he is in an ongoing violent feud with Ernest “Pickles” Harris, present closer calls. The majority found these statements admissible as probative of Lee’s “motive.” I am less sure.
First, it is questionable that “motive” is relevant in a case such as this. Lee did not contend that he had no reason to possess a gun, and we are not faced with a situation where answering “why” would help solve the crime of possession. There is no suggestion in the record that Lee was on his way to a confrontation with Ernest “Pickles” Harris, or to protect his family, or to do anything else with a gun at that particular moment. If relevant at all, Lee’s family feud is not of great probative value with respect to the question of whether he in fact was in possession of a gun on this particular occasion.[4]
Second, and perhaps most importantly, the District Court did not rule that these *200 statements were admissible as relevant to motive. Instead, the District Court ruled that the statements were “admissible to prove intent, knowledge and/or the absence of mistake.”[5] App. 5. The majority quite properly rejects the “knowledge” theory of admissibility, but concludes that the “government does far better with motive as a theory of admissibility,” Majority Op. 187, in effect substituting its own theory as to why some of the statements might have been permissibly admitted. The majority’s conclusion as to relevance to motive is undermined by the fact that we are to review the ruling of the District Court, which held that “[ejvidence that Defendant had knowingly possessed firearms at other times is proper to prove knowledge and intent and not excludable under Rule 404(b).” App. 5. This is the ruling that we are to review — not some hypothetical alternative ruling that the District Court might have made. It is true that the Government argued the motive theory, briefly, before the District Court, and it advances that theory before us as well. The District Court did not admit the statements as relevant to Lee’s motive. Indeed, the fact that this theory was advanced by the Government, but not relied upon by the District Court in its ruling, actually suggests that the District Court rejected this rationale.[6] Accordingly, we must consider the District Court’s stated rationale for admitting the statements: that “[ejvidence that Defendant had knowingly possessed firearms at other times is proper to prove knowledge and intent.” App. 5.
As the majority convincingly argues, the knowledge and intent rationales for admitting the statements do not hold water:
Lee’s trial ... was not about whether he knew that he had a rifle in the back seat of his Jeep. There was no question of accident or mistake. Rather, Lee’s defense was simply that there was no rifle in his Jeep and that the rifle recovered at the Apartments was not his.... Lee has not put knowledge at issue. Lee is not arguing that he did not know there was a rifle in his back seat. His argument is a straightforward denial that any gun was there.
Majority Op. 186-87. Thus, evidence going to either knowledge or intent is not “relevant” as required by Huddleston’s second prong, a fact the majority implicitly recognizes in a footnote. Majority Op. 186 n. 18. I conclude, therefore, that the two statements were admitted for an improper purpose.
We might be able to somehow justify the admission of these statements, albeit for the wrong reason, were it not for the importance we have placed on having the trial court draw the jury’s attention to the specific aspect of the case to which the particular evidence relates. In United States v. Sampson, the Government urged the admissibility of a prior drug conviction *201 as demonstrating “plan or scheme” and “refuting an accident or mistake” defense. 980 F.2d 883, 885 (3d Cir.1992). The trial court indicated that the evidence “fall[s] within the purview of the exceptions listed in 404(b),” and instructed the jury that “[y]ou may consider the defendant’s prior convictions only as they relate to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, and not for any other purpose.” Id. at 888-89. We reversed and remanded, after concluding that both the ruling and the instructions were flawed, and, furthermore, that the Rule 403 balancing required under Rule 404(b) was not apparent from the record. Id. Regarding the trial court’s ruling, we said:
The district court, if it admits the evidence, must in the first instance, rather than the appellate court in retrospect, articulate reasons why the evidence also goes to show something other than character. Unless the reason is apparent from the record, a mere list of the purposes found in Rule 404(b) is insufficient. The district court must put a chain of inferences into the record, none of which is the inference that the defendant has a propensity to commit this crime.
Id. at 888.[7] As to the instruction to the jury, we said:
This instruction does not cure the error. Where the government has not clearly articulated reasons why the evidence is relevant to any legitimate purpose, there is no realistic basis to believe that the jury will cull the proper inferences and material facts from the evidence. By simply repeating the entire litany of permissible theories under Rule 404(b), the judge’s instruction gave the jury inadequate guidance. It also failed to limit the government to the theories it proffered in support of admission of the evidence.
Id. at 889. As to the balancing of probative value versus prejudice, we noted:
When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling. Where, however, the court failed to perform this analysis, or where its rationale is not apparent from the record, there is no way to review its discretion.
Id. at 889 (citation omitted). We concluded:
In sum, we are not holding that the evidence of Sampson’s prior drug convictions is not relevant to a proper purpose. We simply hold that a legitimate relevance has not been properly demonstrated and that the record does not show that the court conducted a Rule 403 balancing. In the new trial, if the government again tries to introduce the evidence, it must carry the burden of proffering a rational chain of inferences and the district court must then evaluate the given reasons in the context of the developing case and give the rationale for its ruling. We will reverse and remand for a new trial.
Id. Thus, we held in Sampson that the district court must identify the proper purpose and instruct the jury as to exactly how it should use the evidence.[8] That did *202 not occur here. Instead, the District Court instructed the jury reciting the litany of possible proper purposes: “You may consider this evidence only for the purpose of deciding whether the defendant had the state of mind, knowledge, motive or intent necessary to commit the crime charged in the indictment, or did not commit the acts for which he is on trial by accident or mistake.” App. 596. The Rule 403 balancing was a single statement in the District Court’s ruling: “Additionally, such evidence is highly probative and not ex-cludable under Rule 403 as its prejudicial effect does not outweigh its probative value.” App. 5.
Although our review standard is extremely deferential,[9] we should be hard-pressed to approve of the District Court’s ruling as to the admissibility of even the motive evidence when the District Court failed to identify the correct purpose, conduct the Rule 403 balancing with reference to the correct purpose, or draw the jury’s attention to the purpose that even the majority concludes was the only permissible purpose, namely, motive. I conclude that, in light of the plain language of Rule 404 and our ruling in Sampson, the District Court did err here because the reasoning, instructions, and balancing were inadequate as to the “motive” statements. I also conclude that, even if arguably relevant to some proper purpose, the extremely prejudicial nature of these statements outweighed any probative value under the Rule 403 prong. The majority never addresses the issue of prejudice, but as I noted above, when the crime pertains to guns I suggest that painting the defendant’s character and past as effectively gun-filled is prejudicial indeed. As to the rest of the statements, they did nothing other than reinforce the notion that Lee is the type of person who possesses guns, shoots them at people, carries them in his car, and has run-ins with, and evades, law enforcement. This testimony had no proper purpose or probative value whatsoever.
Given the damning nature of these statements, I think it very difficult to conclude that the introduction of these statements was harmless. The majority correctly notes that the appropriate test for ‘harmlessness’ is “whether it is highly probable that evidentiary error did not contribute to conviction.” Majority Op. 189 (citing United States v. Ali, 493 F.3d 387, 392 n. 3 (3d Cir.2007) (citing Gov’t of V.I. v. Toto, 529 F.2d 278, 283-84 (3d Cir.1976))). But, we have also stated that an appropriate standard for “errors affecting nonconstitu *203 tional trial rights,” as in this case, is “whether the error ‘had substantial and injurious effect or influence in determining the jury’s verdict.’ ” United States v. Toliver, 330 F.3d 607, 612 (3d Cir.2003) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). These two statements of the test are both borne of the Supreme Court’s reasoning in Kotteakos. In Government of the Virgin Islands v. Toto, the case from which the majority draws its test, we noted that “[w]e are thus required to apply in this case the test of Kotteakos. We must decide ‘whether the error itself had substantial influence (on the minds of the jury.) [sic] If so, or if one is left in grave doubt, the conviction cannot stand.’ ” 529 F.2d at 283 (citing Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239). We also noted that “stating the test is easier than applying it,” id., which remains true even if we focus only on the question of whether it is highly probable that evidentiary error did not contribute to conviction. It is worth returning to Kotteakos for guidance, as the Supreme Court eloquently expounded on the proper way in which we, the reviewing court, should assess whether an error was “harmless” in the context of determining the effect of errors in a criminal case:
[I]t is not the appellate court’s function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error.
But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error’s effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury’s decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one’s own, in the total setting.
This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others’ reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.
If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if *204 one is left in grave doubt, the conviction cannot stand.
328 U.S. at 763-65, 66 S.Ct. 1239.
Accordingly, we are not to look solely at the quality or quantum of the evidence of guilty (“whether there was enough to support the result,” id. at 765, 66 S.Ct. 1239), but “even so” did the error have “substantial influence.” Here, the other evidence of guilt was not overwhelming; every aspect was a judgment call: Was Digger’s reaction a clear identification that the rifle in the woods was Lee’s rifle? Was what Officer Kraus saw in Lee’s car, during the brief time it was stopped, a rifle? Lee was never seen in the woods; he was found in an apartment, hiding in a couch, two weeks later. There was no forensic evidence or eyewitness who ever saw Lee with the gun in question, or who could identify the gun as Lee’s. If the jury knew nothing about Lee, would it have been more likely to have had reasonable doubt and acquit? Did the statements detailing Lee’s extensive experience with guns, and prior criminal activity known to Officer Kraus, sway or influence the jury?[10] “If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.” Id. at 764, 66 S.Ct. 1239. In light of the nature of the other evidence, and the nature of the statements, I do not have this “conviction,” and am left in “grave doubt.” I would thus conclude that the error was not harmless and that a new trial is warranted.

. Although the District Court and the majority opinion refer to, respectively, "Defendant’s statements made by him at the time of his arrest,” App. 5, and "Lee’s Statements Regarding His Prior Possession of Firearms,” Majority Op. 185, the. evidence in question is actually Officer Kraus’s testimony regarding his report of statements Lee purportedly made to him post-arrest. These were not transcribed statements, nor were they statements in Lee's own words, and the report was not made part of the record as far as I can tell.

. The majority does not explicitly discuss the admission of statement 3, the statement that Lee "shot at an individual named Pickles, who was well known as Ernest Harris, on multiple occasions,” instead folding this statement into its analysis regarding the "violent feud” between Lee and Harris. Majority Op. 185. This is significant, given that perhaps the most grave prior bad act evidence introduced is that Lee supposedly stated that he had shot at Harris. It is not clear how the fact that Lee shot at Harris 'adds' anything relevant to Lee's motive for possessing a gun, once it is established that Lee and Harris are engaged in an ongoing violent feud.

. The majority takes me to task for parsing the statements in a way the defense did not, Majority Op. at pp. 188-89 n. 20, since the defense urged total exclusion. But I urge total exclusion as well. And the statements are parsed only for ease of reference and in order to follow the majority's analysis which distinguishes among them.

. We have noted that the probative value of prior bad acts evidence “is significantly less” when the defense is that the defendant did not perform the charged act at all. United States v. Daraio, 445 F.3d 253, 265 (3d Cir.2006) (quoting United States v. Jemal, 26 F.3d 1267, 1273 n. 3 (3d Cir.1994)).

. The District Court did refer to "state of mind, knowledge, motive or intent” in its instructions to the jury. App. 596.

. The majority writes: "By offering motive as a basis on which the jury could consider the evidence, the District Court necessarily concluded that motive was a proper basis for admission of one or more of the statements.” Majority Op. 188 n.19. Although this inference might malte sense in theory, it is not appropriate here. The District Court instructed the jury that it could consider the statements for state of mind, knowledge, motive, intent, or absence of accident or mistake. App. 596. But there is no reason to suppose that the District Court concluded that, for example, absence of accident or mistake was a proper basis for admission. Rather, it seems that the District Court was simply reciting the litany of potentially proper purposes. More to the point, if the District Court concluded that motive was a proper basis for admission, it should have said so.

. Contrary to the majority's contention that the reason for admission would have been apparent from the record, Majority Op. 188 n. 19, I submit that the jury would not readily understand that the gun feud evidence was relevant to, and only to, Lee’s motive.

. The Third Circuit Manual of Model Jury Instructions makes this same point, instructing judges to "describe the precise purpose or purposes for which the other act evidence was admitted," and to "[p]ick those of the following, or other reasons, that apply,” followed by a list of example reasons, including *202 state of mind, knowledge, intent, motive, opportunity, preparation, planning, modus operandi, absence of accident or mistake, and identity. Third Circuit Mod.Crim. Jury Instr. 4.29 (emphasis added). The Comment to the Model Instructions also stresses that the “instruction should not merely include a laundry list of permitted uses of other act evidence. Rather, it should specifically state the limited purpose for which the other act evidence is admitted.” Third Circuit Mod.Crim. Jury Instr. 4.29 cmt. (citing Michael H. Graham, Handbook of Federal Evidence, § 404.5 n. 56 (5th ed.2001)).
The majority suggests that the District Court’s instruction “followed nearly word-for-word our Circuit's model 404(b) instruction.” Majority Op. 191 n. 25. Although it is true that the words the District Court used are found in our Circuit’s model instruction, the District Court failed to do as the manual advises, namely, to "describe the precise purpose” for which the other act evidence was admitted, and to "pick” the reasons that apply-

. While we are to be deferential to the trial court and review for abuse of discretion, here the District Court did not admit any of the statements for a proper purpose under Rule 404, and violation of the Rule is an abuse of discretion. "A district court by definition abuses its discretion when it makes an error of law.” Koon v. United States, 518 U.S. 81, 99, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

. It is worth noting that, since the statements were presented as coming from Lee himself, additional concerns arise. In a different context, the Supreme Court has stated "admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (citation omitted). Fulminante dealt with the admission of a coerced confession; here,, we have no issue of coercion. However, because it was reported by Kraus (whose credibility was a central concern in the case), and it was not committed to writing or acknowledged by Lee, we arguably face similar concerns as to reliability: "the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.” Id.